**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| TONI RAYNES, SUFEL BARKET, NASHYA WILLIAMS, MONIFA SCOTT, MELISSA KUPSKI, LYDIA VELOZ AND LAUREN KRAVETZ, individually and on behalf of all others similarly situated, | ) | **CIVIL ACTION NO.:** |
| Plaintiff, | ) | |
| v. | ) | |
| Arthur J. Gallagher (Illinois), LLC, | ) | |
| Defendant. | ) | |

**CLASS ACTION COMPLAINT**

Plaintiffs, Toni Raynes, Sufel Barkat, Nashya Williams, Monifa Smith, Melissa Kupski, Lydia Veloz and Lauren Kravetz ("Plaintiffs"), by and through their attorneys, on behalf of the Arthur J. Gallagher & Co. Illinois Employees' Self-Funded Medical/Dental Plan and Insured Benefits (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I. INTRODUCTION

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciary, Arthur J. Gallagher (Illinois), LLC ("AJG" or the "Company") for breaches of its fiduciary duties.

2. Plaintiffs bring this action to redress prohibited transactions and self-dealing in violation of 29 U.S.C. § 1106(b) by AJG, which acted as a fiduciary to the Plan in connection with

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

the selection, marketing, and placement of voluntary benefits and the receipt of compensation derived from participant-paid premiums. As explained below, AJG exercised fiduciary authority to select and maintain insurance arrangements for the Plan from which AJG itself received millions of dollars of compensation; AJG participated in determining the amount and structure of that compensation.

3. The Plan is an employee welfare benefit plan governed by ERISA, 29 U.S.C. § 1002(1), that offered voluntary benefit products to Plan participants, including but not limited to life insurance and accidental death & dismemberment, long-term disability, legal, accidental death & dismemberment, stop loss (large deductible) and other similar coverages funded through payroll-deducted, participant-paid premiums.

4. In the voluntary benefits market, insurance carriers do not set premium rates independently and then separately negotiate broker compensation.[2] Rather, the process works in reverse. AJG, as the broker, specifies the commission structure. That structure can be a "heaped" commission (a high first-year payout followed by lower renewal rates) or a "level" commission (a consistent percentage paid every year).[3]

5. As the broker, AJG also sets the benefits administration fee, an additional cost that compensates AJG for consulting, providing ongoing services, additional commission or compensation and for enrollment firms (specialized third-party companies that manage

[2] *See* Mployer Team, *Insurance Broker vs. Carrier* (Updated August 14, 2023), https://mployeradvisor.com/blog/insurance-broker-vs-carrier ("this commission is built into the premiums paid by policyholders every month. Thus, it's not a separate payment, but included in the price of the policy purchased through the broker.").

[3] *See* Trevor & Heather Garbers, The Commission Conundrum (March 2023), https://issuu.com/voluntary-advantage/docs/vb_voice_-_march_2023/6?e=8&o=1.

communication, education, technology and sign-up process) for technology platforms and enrollment support services.

6. The insurance carrier will include the commission and administration fee into the premium rate structure that participants pay. In doing so, the insurance carrier prices the product to achieve its target profitability after accounting for any commissions, the administration fees, its own administrative costs, and its profit margin. Thus, in the instant case, the participants' premium payments are a direct function of AJG's compensation demands. When AJG demands more, the carrier charges more, and participants pay more.

7. Defendant, while acting with respect to the management or disposition of Plan assets, engaged in self-dealing by setting, collecting and retaining commission compensation and administration fees out of Plan assets, in contravention of ERISA.

8. Defendant failed to avoid self-dealing and conflicts of interest, and failed to ensure that any compensation received from dealing with the Plan complied with ERISA's strict prohibitions under 29 U.S.C. § 1106(b), including by obtaining appropriate authorization and ensuring that any compensation did not result from Defendant acting in any transaction involving the Plan on behalf of a party whose interests were adverse to those of the Plan and its participants.

9. Defendant's compensation structure and receipt of commissions and administration fees influenced or had the tendency to influence its recommendations and actions regarding the selection, marketing, and placement of voluntary benefits, and the level and cost of those benefits to participants.

10. Plaintiffs, on behalf of themselves, the Plan, and the class of similarly situated Plan participants, seek equitable relief including restitution and disgorgement of ill-gotten commissions and profits, pursuant to 29 U.S.C. § 1132(a).

11. Based on this conduct, Plaintiffs assert claims against Defendant for engaging in ERISA's prohibited transactions (Count I), and breach of the fiduciary duty of loyalty (Count II).

## II. JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

13. This Court has personal jurisdiction over Defendant because Defendant transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the Plan is administered in this District, the alleged breaches took place in this District, and/or Defendant may be found in or transacts business in this District.

## III. PARTIES

### Plaintiffs

15. Plaintiff Toni Raynes ("Raynes") resides in Waveland, Mississippi. Plaintiff Raynes is a participant and beneficiary of the Plan, and paid premiums for voluntary benefit products placed and administered with the involvement of Defendant, including accidental death & dismemberment and legal.

16. Plaintiff Sufel Barkat ("Barkat") resides in Gurnee, Illinois. Plaintiff Barkat is a participant and beneficiary of the Plan, and paid premiums for voluntary benefit products placed and administered with the involvement of Defendant, including accidental death & dismemberment, and accident.

17. Plaintiff Nashya Williams ("Williams") resides in Greenville, South Carolina. Plaintiff Williams is a participant and beneficiary of the Plan, and paid premiums for voluntary benefit products placed and administered with the involvement of Defendant, including accidental death & dismemberment.

18. Plaintiff Monifa Smith ("Smith") resides in Cincinnati, Ohio. Plaintiff Smith is a participant and beneficiary of the Plan, and paid premiums for voluntary benefit products placed and administered with the involvement of Defendant, including accidental death & dismemberment and legal.

19. Plaintiff Melissa Kupski ("Kupski") resides in Plainfield, Illinois. Plaintiff Kupski is a participant and beneficiary of the Plan, and paid premiums for voluntary benefit products placed and administered with the involvement of Defendant, including accidental death & dismemberment and legal.

20. Plaintiff Lydia Veloz ("Veloz") resides in Bronx, New York. Plaintiff Veloz is a participant and beneficiary of the Plan, and paid premiums for voluntary benefit products placed and administered with the involvement of Defendant, including accidental death & dismemberment.

21. Plaintiff Lauren Kravetz ("Kravetz") resides in West Bridgewater, Massachusetts. Plaintiff Kravetz is a participant and beneficiary of the Plan, and paid premiums for voluntary benefit products placed and administered with the involvement of Defendant, including accidental death & dismemberment.

22. Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan, paid premiums for voluntary benefit products, and were injured by Defendant's unlawful conduct.

23. Plaintiffs did not have knowledge of all material facts necessary to understand that Defendant breached its fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendant**

24. Arthur J. Gallagher (Illinois), LLC is the sponsor and a named fiduciary of the Plan with a principal place of business at 2850 Golf Road, Rolling Meadows, Illinois. *See* 2024 Form 5500 for the Plan, at 1-2. AJG engages in brokerage and consulting services related to employee benefit plans, including voluntary benefits plans.

25. At all relevant times, AJG acted as a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A) with respect to the Plan and/or Plan assets by, among other things, exercising discretionary authority or control over plan management or assets, and/or having discretionary authority or responsibility in plan management and administration.

26. AJG occupied both sides of the voluntary benefits transactions. In its capacity as Plan sponsor and fiduciary, AJG exercised authority and discretion concerning which carriers and products would be made available through the Plan and on what terms. At the same time, in its capacity as broker and benefits consultant, AJG stood to receive commissions and other compensation generated by the very insurance arrangements that it selected, recommended, retained, and administered for the Plan.

27. Upon information and belief, AJG also exercised authority or influence over the amount and structure of the compensation payable to itself, including whether compensation would be paid as a level commission, a heaped commission, a flat annual commission, an administration fee, or another form of carrier-paid or premium-funded compensation. Thus, AJG was not merely collecting compensation fixed in advance by an independent fiduciary in an arm's-length

transaction; rather, it had the ability to affect the compensation it would receive through decisions concerning the Plan's voluntary benefit arrangements.

28. Accordingly, AJG during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

## IV. CLASS ACTION ALLEGATIONS

29. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[4]

> All persons who were participants in the Plan, and who were participants in voluntary benefit products placed and administered with the involvement of Defendant at any time between September 17, 2020 through the date of judgment (the "Class Period").

30. The members of the Class are so numerous that joinder of all members is impractical. At the start of the Class Period, there were 15,907 active participants. *See* 2020 Form 5500 for the Plan, at 2. By 2024, there were 23,562 active participants. *See* 2024 Form 5500 for the Plan, at 2. Many of the Plan's participants paid premiums for the voluntary benefits offered under the Plan.

31. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan, and were participants in voluntary benefit products that were selected and administered with the involvement of Defendant. Plaintiffs have suffered injuries as a result of Defendant's mismanagement of the Plan. Defendant treated Plaintiffs consistently with other Class members. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendant as alleged herein, and all members of the Class have been similarly affected by Defendant's wrongful conduct.

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in this motion for class certification or subsequent pleadings in this action.

32. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A. Whether Defendant is/was a fiduciary of the Plan;

B. Whether Defendant breached its fiduciary duty of loyalty by engaging in the conduct described herein;

C. Whether Defendant committed prohibited transactions by engaging in the conduct described herein;

D. The proper form of equitable and injunctive relief; and

E. The proper measure of monetary relief.

33. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

34. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

35. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V. DEFENDANT HAS BEEN ENGAGING IN PROHIBITED SELF-DEALING WITH THE PLAN

### A. The Plan

36. In addition to traditional employee welfare benefits, employers often provide their employees with the opportunity to purchase voluntary benefits, such as life insurance and accidental death & dismemberment, long-term disability, legal, accidental death & dismemberment, stop loss (large deductible), and other similar coverages. Unlike traditional benefits, which are usually subsidized by the employer, the entire cost of these voluntary benefits is paid by the employee through a payroll deduction.

37. Voluntary benefits have existed for decades, but recent market trends indicate that employers increasingly offer voluntary benefits "because they allow employers to expand the benefits package without absorbing significant direct cost, while giving employees options that feel relevant to their specific needs and life stage."[5]

38. Employers who sponsor voluntary benefits plans must comply with ERISA unless the plans qualifies for the Department of Labor's specific "safe harbor" exemption.[6] "For a benefit

---

[5] Selerix, *9 Employee Benefits Trends Shaping 2026* (July 10, 2026), https://selerix.com/blog/trends-in-employee-benefits/.

[6] *See* Grace Elliot & Laura L. Ferguson, *Are Your 'Voluntary Benefits' Really Exempt From ERISA? It's Worth Checking* (Apr. 22, 2026), https://www.troutman.com/insights/are-your-voluntary-benefits-really-exempt-from-erisa-its-worth-checking/.

to be exempt from ERISA as a voluntary benefit, the benefit must meet each of the following requirements:

1. No contributions are made by the employer;
2. Participation in the benefit program is completely voluntary for employees;
3. The only function the employer provides is, without 'endorsing' the program: (i) permitting the insurer of the plans to publicize the program to employees or members, (ii) collecting premiums through payroll deductions, and (iii) remitting those premiums to the insurer; and
4. The employer receives no consideration — in the form of cash or otherwise — in connection with the benefit program, other than reasonable compensation for administrative services actually rendered in connection with payroll deductions or dues checkoffs.[7] The employer may not make any profit from providing such administrative services."[8]

*Id*.

39. AJG concedes through the filing of the Plan's Form 5500s that the Plan is subject to ERISA. *See* 2024 Form 5500 for the Plan, at 1 ("This form is required to be filed for employee benefit plans under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA) …").

[7] *See* Labor Regulation § 2510.3-1(j).
[8] Elliot & Ferguson, *supra*.

40. AJG exercised discretionary, authority and control over the management and administration of the voluntary benefits program, including by establishing the voluntary benefits program, selecting and retaining itself as the primary broker for the voluntary benefits program, promoting the voluntary benefits program during annual open enrollment through company-wide communications and enrollment materials distributed to employees in its, *inter alia*: 1) Your 2024 Benefit & Cost Summary for US. Employees (Exhibit A); 2) Your 2025 Benefit & Cost Summary for US. Employees (Exhibit B); 3) 2026 Benefits: Employee Cost Summary (Exhibit C); and 4) 2026 Gallagher Benefits Enrollment (Exhibit D).

41. AJG's actions in recommending, selecting, and retaining insurers and products; structuring and receiving compensation tied to participant-paid premiums; and influencing plan administrative processes with respect to voluntary benefits, all constitute fiduciary conduct.

42. Further, through its actions, AJG has endorsed the services provided under the Plan, thus subjecting its actions, and the Plan itself, to governance under ERISA.

**B. AJG Had/Has Fiduciary Responsibilities Concerning the Administration of the Voluntary Benefit Plans**

43. An entity "is a fiduciary with respect to a plan" if it "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

44. Under ERISA, employers have a duty to select insurers for their employees with care. *Radford Tr. v. First UNUM Life Ins. Co. of Am*., 321 F. Supp. 2d 226, 249 (D. Mass. 2004).

45. Plan sponsors who choose service providers for a plan have a fiduciary duty to diligently and prudently select such providers, including voluntary insurance benefit administrators. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 114 (2008) (describing the process of "buy[ing] insurance for others" in an ERISA-governed plan, including selecting an administrator and evaluating rates and claims processing ability); *see also* 29 U.S.C. § 1002(21)

(stating that a fiduciary is one who exercises "discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets").

46. AJG, in addition to being the Plan administrator, held itself out as the broker and consultant for the Plan with respect to the selection, marketing, and placement of voluntary benefit products, including soliciting proposals, evaluating carriers, recommending products, negotiating terms, facilitating enrollment, and arranging compensation structures.

47. In performing these functions, AJG exercised discretionary authority and control over plan management and/or plan assets, rendered advice for a fee or other compensation with respect to the selection and retention of insurers and products, and had discretionary responsibility in plan administration related to voluntary benefits.

48. AJG arranged, received, and retained compensation in the form of commissions and other consideration embedded in participant-paid premiums. *See* Schedule A's attached to 2020-2024 Form 5500s for the Plan.

49. The commissions and administration fees paid to AJG were tied to the volume or amount of participant-paid premiums, and were paid by parties dealing with the plan – namely the insurance carriers – in connection with transactions involving plan assets.

50. Pursuant to the Department of Labor's Plan Asset Regulation, 29 C.F.R. § 2510.3-102(a)(1), the assets of an ERISA plan include amounts that a participant has withheld from his or her wages by an employer for contribution to the plan. Under this explicit regulatory command, these payroll deductions become plan assets as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets.

51. At the exact moment a plan sponsor segregates participant premium contributions from its general corporate payroll accounts, those funds transform into ERISA plan assets by operation of law. These plan assets are dedicated exclusively to providing benefits and defraying reasonable plan administration expenses under 29 U.S.C. § 1103(c)(1).

52. AJG did not merely negotiate a separate arm's-length commercial fee with insurance carriers out of independent corporate funds. Instead, because the participant-paid premium rates were a direct mathematical function of AJG's compensation demands, the plan assets deducted from Plaintiffs' paychecks were artificially inflated. Consequently, when those segregated plan assets were routed, whether through a dedicated plan trust account, a third-party administrator clearing account, or directly to the carrier, AJG intercepted and extracted its compensation directly from funds that retained their character as plan assets.

53. AJG, while acting with respect to the management or disposition of Plan assets, engaged in self-dealing by setting, collecting, and retaining commission compensation and administration fees out of Plan assets, in contravention of ERISA.

54. AJG failed to avoid self-dealing and conflicts of interest, and failed to ensure that any compensation received from dealing with the Plan complied with ERISA's strict prohibitions under 29 U.S.C. § 1106(b), including by obtaining appropriate authorization and ensuring that any compensation did not result from AJG acting in any transaction involving the Plan on behalf of a party whose interests were adverse to those of the Plan and its participants.

55. AJG's compensation structure and receipt of commissions and administration fees influenced or had the tendency to influence its recommendations and actions regarding the selection, marketing, and placement of voluntary benefits, and the level and cost of those benefits to participants.

56. Plaintiffs and other participants elected certain voluntary benefits and paid premiums through payroll deductions, which constituted plan assets because participant contributions were held by or on behalf of the Plan for the purpose of providing benefits and defraying reasonable Plan administrative expenses.

57. AJG did not simply receive a commission independently determined and paid by the carrier from general assets. Upon information and belief: AJG determined or negotiated the compensation it would receive; the carrier incorporated that compensation into the premium quoted to the Plan; AJG, acting as the Plan fiduciary responsible for carrier/product selection, then caused the Plan to accept the resulting premium; participants' payroll contributions funded that premium; and the carrier remitted the predetermined portion of those payments to AJG. The premium deducted from participants' wages therefore included an identifiable economic charge attributable to AJG's compensation.[9]

58. The conflict inherent in this arrangement was direct. In negotiating or selecting a voluntary benefit program, AJG had a fiduciary interest in obtaining favorable terms and lower costs for Plan participants, while simultaneously having a corporate financial interest in maximizing the commissions and fees payable to itself. To the extent a carrier incorporated AJG's requested compensation into the premium, reducing AJG's compensation would reduce the amount that had to be recovered through participant premiums, all else being equal.

[9] Nevertheless, even if an insurance carrier obtained title to premium amounts before remitting AJG's commission, ERISA § 406(b)(3) separately prohibits a fiduciary from receiving consideration for its own account from a party dealing with the Plan in connection with a transaction involving Plan assets. The commissions alleged here were paid by the insurance carriers because of, and in connection with, the Plan insurance transactions and the participant contributions which were used to purchase the insurance coverage.

59. ERISA required AJG to resolve that conflict in favor of the Plan and its participants and prohibited AJG from using fiduciary authority over Plan transactions to generate additional compensation for itself. AJG instead selected and retained arrangements under which it received compensation tied to the participant-funded insurance products over which it exercised fiduciary authority.

60. AJG failed to avoid self-dealing and conflicts of interest, and failed to ensure that any compensation received from parties dealing with the plan complied with ERISA's strict prohibitions under 29 U.S.C. § 1106(b), such as by obtaining appropriate authorization and ensuring that any compensation did not result from AJG acting in any transaction involving the Plan on behalf of a party whose interests were adverse to those of the Plan and its participants.

61. Defendant's compensation structure and receipt of commissions and fees influenced or had the tendency to influence its recommendations and actions regarding the selection, marketing, and placement of voluntary benefits, and the level and cost of those benefits to participants

62. No independent Plan fiduciary is identified in the Plan's Form 5500 filings or participant materials as having independently negotiated, approved, or monitored AJG's broker compensation for the challenged voluntary-benefit products. Plaintiffs allege, on information and belief, that AJG did not establish an effective independent-fiduciary process to determine whether AJG should receive compensation from these transactions or, if so, the amount and structure of such compensation

**C. AJG's Voluntary Benefits Program**

63. At the start of the Class Period, the Plan had 15,907 participants. *See* 2020 Form 5500 for the Plan, at 2.

64. By 2024, the Plan had 23,562 participants. *See* 2024 Form 5500 for the Plan, at 2.

65. The majority of insurance carriers for the voluntary benefits have remained the same since the start of the Class Period, and in some instances, well before the Class Period.

66. As discussed above, and at all relevant times, AJG acted as a fiduciary of the voluntary benefits program.

67. During the Class Period, AJG, directly or through affiliated entities, received broker commissions and administration fees in amounts identified in the table below.

| **Plan Year** | **Commissions Paid** | **Administration Fees Paid** | **Total Commission and Administration Fees Paid** |
|---|---|---|---|
| 2024 | $1,216,659 | $97,438 | $1,314,097 |
| 2023 | $1,167,748 | $73,756 | $1,241,504 |
| 2022 | $827,586 | $47,563 | $875,149 |
| 2021 | $430,188 | $84,400 | $514,588 |
| 2020 | $775,485 | $27,594 | $803,079 |
| **TOTAL** | **$4,417,666** | **$330,751** | **$4,748,417** |

#### 1. AJG Committed Prohibited Transactions and Breached its Fiduciary Duties by Selecting the Life Insurance and Accidental Death & Dismemberment Plan

68. Since 2009, AJG acted as a fiduciary by administering and selecting the life insurance and accidental death & dismemberment voluntary insurance policies available to participants.

69. Prudential Insurance Company of America was the insurance carrier for AJG's life insurance and accidental death & dismemberment voluntary insurance voluntary insurance policy in 2024. From 2009 through 2023, Life Insurance Company of North America was the insurance carrier.

70. AJG or its affiliates collected commissions and administration fees from the premiums paid by participants in the Plan. Starting in 2009, Gallagher Benefit Services, Inc.[10] collected commissions for the life insurance and accidental death & dismemberment voluntary insurance policy. Starting in 2014 Gallagher Benefit Services, Inc. collected administration fees for the life insurance and accidental death & dismemberment voluntary insurance policy, as demonstrated in the table below.

71. The table below demonstrates the total commissions and administration fees paid to AJG or its affiliates for the life insurance and accidental death & dismemberment voluntary insurance policy.

| **Plan Year** | **Life Ins. And AD&D Plan Participants** | **Amt. Commissions Paid** | **Amt. Administration Fees Paid**[11] | **Total Commission and Administration Fees Paid** | **Total Premium** |
|---|---|---|---|---|---|
| 2024 | 38,535 | $530,945 | $0 | $530,945 | unknown |
| 2023 | 21,006 | $631,180 | $0 | $631,180 | $6,311,803 |
| 2022 | 19,862 | $775,293 | $34,018 | $809,311 | $7,752,928 |
| 2021 | 17,411 | $378,390 | $25,000 | $403,390 | $3,783,900 |
| 2020 | 15,888 | $499,548 | $18,750 | $518,298 | $3,783,900 |
| 2019 | 16,517 | $437,826 | $31,250 | $469,076 | $4,378,260 |
| 2018 | 15,940 | $414,930 | $50,793 | $465,723 | $4,149,296 |
| 2017 | 14,563 | $321,110 | $37,500 | $358,610 | $3,211,097 |
| 2016 | 13,370 | $318,106 | $25,000 | $343,106 | $3,181,061 |
| 2015 | 12,851 | $290,514 | $18,292 | $308,806 | $2,905,137 |
| 2014 | 11,679 | $253,208 | $30,099 | $283,307 | $2,532,082 |
| 2013 | 10,671 | $250,877 | $0 | $250,877 | $2,208,995 |
| 2012 | 10,196 | $229,732 | $0 | $229,732 | $1,917,657 |

[10] Gallagher Benefit Services, Inc. and Defendant, Arthur J. Gallagher & Co. (Illinois) LLC, are both corporate subsidiaries and affiliates under the same ultimate parent company, Arthur J. Gallagher & Co. *See* https://www.sec.gov/Archives/edgar/data/354190/000119312504016970/dex21.htm.

[11] The Administration Fee for Plan years 2020 through 2022 was identified as a "Sales & Service Override" or "Override" in the Form 5500s. *See* 2020-2022 Form 5500s.

| | | | | | |
|---|---|---|---|---|---|
| 2011 | 9,493 | $181,596 | $0 | $181,596 | $1,815,961 |
| 2010 | 9,443 | $180,408 | $0 | $180,408 | $1,795,697 |
| 2009 | 9,288 | $176,427 | $0 | $176,427 | $1,793,418 |
| **TOTAL** | | **$5,870,090** | **$270,702** | **$6,140,792** | |

72. The total amount of commissions paid for the life insurance and accidental death & dismemberment voluntary insurance policy to AJG or its affiliates during the Class Period was $2,815,356, and the administration fees totaled $77,768 during that same period of time.

**2. AJG Committed Prohibited Transactions and Breached its Fiduciary Duties by Selecting the Long-Term Disability Plan**

73. At all relevant times, AJG acted as a fiduciary by administering and selecting the long-term disability voluntary insurance policies available to participants.

74. Since 2020, Hartford Life and Accident ("Hartford") was the insurance carrier for the long-term disability voluntary insurance policy.

75. From 2010 through 2019, Reliance Standard Life Insurance Company ("Reliance") was the insurance carrier for the long-term disability voluntary insurance policy. When Reliance was the insurance carrier, no commissions were paid to any brokers.

76. Starting in 2023, Gallagher Benefit Services, Inc. collected commissions for the premiums paid for the long-term disability voluntary insurance policy. Starting in 2010, Gallagher Benefit Services, Inc. collected administration fees for the premiums paid for the long-term disability voluntary insurance policy as demonstrated in the table below.

| **Plan Year** | **Long-Term Disability Plan Participants** | **Amt. Commissions Paid** | **Amt. Administration Fees Paid**[12] | **Total Commission and Administration Fees Paid** | **Total Premium** |
|---|---|---|---|---|---|
| 2024 | 22,789 | $544,737 | $84,596 | $629,333 | $7,306,339 |

[12] The Administration Fee for Plan years 2021 through 2024 was identified as a "Bonus Paid" in the Form 5500s. *See* 2021-2024 Form 5500s.

| | | | | | |
|---|---|---|---|---|---|
| 2023 | 20,068 | $421,092 | $68,577 | $489,669 | $5,639,725 |
| 2022 | 17,908 | $0 | $5,738 | $5,738 | $4,571,813 |
| 2021 | 16,751 | $0 | $55,210 | $55,210 | $4,421,615 |
| 2020 | 15,547 | $0 | $0 | $0 | $3,904,792 |
| 2019 | 16,192 | $0 | $69,449 | $69,449 | $3,682,920 |
| 2018 | 14,124 | $0 | $64,611 | $64,611 | $3,086,637 |
| 2017 | 13,552 | $0 | $61,127 | $61,127 | $2,871,592 |
| 2016 | 12,811 | $0 | $52,415 | $52,415 | $2,716,766 |
| 2015 | 12,811 | $0 | $33,513 | $33,513 | $2,329,549 |
| 2014 | 11,078 | $0 | $30,480 | $30,480 | $1,506,906 |
| 2013 | 11,078 | $0 | $21,557 | $21,557 | $1,354,649 |
| 2012 | 9,950 | $0 | $20,221 | $20,221 | $958,067 |
| 2011 | 9,187 | $0 | $0 | $0 | $898,717 |
| 2010 | 8,397 | $0 | $15,169 | $15,169 | $847,410 |
| **TOTAL** | | **$965,829** | **$582,663** | **$1,548,492** | |

77. The total amount of commissions paid for the long-term disability voluntary insurance policy to AJG or its affiliates during the Class Period was $965,829, and the administration fees totaled $214,121 during that same period of time.

78. The percentage of the premiums that were paid to AJG or its affiliates for commissions from 2023 through 2024 was 7.5%.

### 3. AJG Committed Prohibited Transactions and Breached its Fiduciary Duties by Selecting the Legal Plan

79. At all relevant times, AJG acted as a fiduciary by administering and selecting the legal voluntary insurance policies available to participants.

80. From 2019 through 2024, MetLife Legal Plans was the insurance carrier for AJG's legal voluntary insurance policies. From 2014 through 2018, Hyatt Legal Plans was the insurance carrier for the legal voluntary insurance policies.

81. As demonstrated in the table below, and starting in 2014 and continuing to 2024, AJG and/or its affiliates received commissions and administration fees for the legal voluntary benefits plan.

| **Plan Year** | **Legal Plan Participants** | **Amt. Commissions Paid** | **Amt. Administration Fees Paid**[13] | **Total Commissions and Administration Fees Paid** | **Total Premium** |
|---|---|---|---|---|---|
| 2024 | 3,593 | $120,896 | $11,436 | $132,332 | $741,141 |
| 2023 | 3,191 | $93,532 | $3,687 | $97,219 | $741,141 |
| 2022 | 2,839 | $52,293 | $7,807 | $60,100 | $669,829 |
| 2021 | 2,645 | $51,798 | $4,190 | $55,988 | $599,621 |
| 2020 | 2,645 | $52,592 | $8,844 | $61,436 | $599,621 |
| 2019 | 2,705 | $52,189 | $8,168 | $60,357 | $602,508 |
| 2018 | 2,473 | $50,912 | $9,291 | $60,203 | $543,141 |
| 2017 | 2,272 | $50,218 | $1,338 | $51,556 | $503,297 |
| 2016 | 1,911 | $43,326 | $41 | $43,367 | $430,635 |
| 2015 | 1,788 | $38,699 | $40 | $38,739 | $381,962 |
| 2014 | 1,530 | $33,872 | $12 | $33,884 | $334,588 |
| **Total** | | **$640,327** | **$54,854** | **$695,181** | |

82. The total amount of commissions paid for the legal voluntary insurance policy to AJG or its affiliates during the Class Period was $371,111, and the administration fees totaled $35,964 during that same period of time.

### 4. AJG Committed Prohibited Transactions and Breached its Fiduciary Duties by Selecting the Accidental Death & Dismemberment Plan

83. At all relevant times, AJG acted as a fiduciary by administering and selecting the accidental death & dismemberment voluntary insurance policies available to participants.

[13] The Administration Fee for Plan years 2020 through 2024 was identified as a "Supplemental Compensation," "Non-Monetary Compensation," and "Marketing Fee" in the Form 5500s. *See* 2020-2024 Form 5500s.

84. From 2015 through 2024, Federal Insurance Company was the insurance carrier for AJG's accidental death & dismemberment voluntary insurance policies.

85. From 2015 to 2022, any commission paid from the premiums for the accidental death & dismemberment policy were paid to Reuben Warner Associates, Inc. – an entirely separate company from AJG.

86. However, from 2023 to 2024, commissions and administration fees were paid to Gallagher Benefit Services Inc.

87. As demonstrated in the table below, and from 2023 to 2024, AJG and/or its affiliates received commissions and administration fees for the accidental death & dismemberment voluntary benefits plan.

| **Plan Year** | **AD&D Plan Participants** | **Amt. Commissions Paid** | **Amt. Administration Fees Paid**[14] | **Total Commissions and Administration Fees Paid** | **Total Premium** |
|---|---|---|---|---|---|
| 2024 | 23,313 | $20,081 | $1,406 | $21,487 | $100,405 |
| 2023 | 21,096 | $21,944 | $1,492 | $23,436 | $109,720 |
| 2022 | 19,036 | $3,876 | $0 | $3,876 | $19,380 |
| 2021 | 17,410 | $0 | $0 | $0 | $0 |
| 2020 | 15,868 | $20,290 | $0 | $20,290 | $101,452 |
| 2019 | 16,680 | $0 | $0 | $0 | $0 |
| 2018 | 16,112 | 16,112 | $0 | $16,112 | $0 |
| 2017 | 14,254 | $18,583 | $0 | $18,583 | $92,914 |
| 2016 | 13,550 | $0 | $0 | $0 | $567 |
| 2015 | 13,016 | $0 | $0 | $0 | $14,810 |
| **Total** | | **$100,886** | **$2,898** | **$103,784** | |

[14] The Administration Fee for Plan years 2020 through 2024 was identified as a "Supplemental Compensation," "Non-Monetary Compensation," and "Marketing Fee" in the Form 5500s. *See* 2020-2024 Form 5500s.

88. The total amount of commissions paid for the accidental death & dismemberment voluntary insurance policy to AJG or its affiliates in 2023 and 2024 was $42,025, and the administration fees totaled $2,898 during that same period of time.

### 5. AJG Committed Prohibited Transactions and Breached its Fiduciary Duties by Selecting the Stop Loss (Large Deductible) Plan

89. At all relevant times, AJG acted as a fiduciary by administering and selecting the stop loss (large deductible) voluntary insurance policies available to participants.

90. From 2011 through 2020,[15] HM Life Insurance Company was the insurance carrier for AJG's stop loss (large deductible) voluntary insurance policies.

91. From 2011 through 2020, commissions were paid to Gallagher Benefit Services Inc.

92. As demonstrated in the table below, AJG and/or its affiliates received commissions for the stop loss (large deductible) voluntary benefits plan.

| Plan Year | Stop Loss (Large Deductible) Plan Participants | Amt. Commissions Paid | Amt. Administration Fees Paid | Total Commissions and Administration Fees Paid | Total Premium |
|---|---|---|---|---|---|
| 2020 | 11,711 | $223,345 | $0 | $223,345 | $1,766,968 |
| 2019 | 12,092 | $188,454 | $0 | $188,454 | $1,490,933 |
| 2018 | 11,572 | $168,981 | $0 | $168,981 | $1,336,876 |
| 2017 | 10,643 | $159,993 | $0 | $159,993 | $1,078,850 |
| 2016 | 10,214 | $159,343 | $0 | $159,343 | $1,074,462 |
| 2015 | 9,661 | $148,532 | $0 | $148,532 | $987,413 |
| 2014 | 5,661 | $160,432 | $0 | $160,432 | $814,457 |
| 2013 | 8,288 | $154,671 | $0 | $154,671 | $759,131 |
| 2012 | 7,900 | $156,204 | $0 | $156,204 | $629,854 |
| 2011 | 7,323 | $119,002 | $0 | $119,002 | $479,848 |
| **Total** | | **$1,638,957** | **$0** | **$1,638,957** | |

[15] AJG stopped offering stop loss (large deductible) voluntary insurance policies after 2020.

93. The total amount of commissions paid for the stop loss (large deductible) voluntary insurance policy to AJG or its affiliates in 2020 was $223,345.

94. The table below demonstrates the total amount of commissions and administration fees AJG or its affiliates received from the premiums paid by its employees who chose to participate in the various voluntary benefits plans.

| Plan Year | Commissions Paid | Administration Fees Paid | Total Commission and Administration Fees Paid |
|---|---|---|---|
| 2024 | $1,216,659 | $97,438 | $1,314,097 |
| 2023 | $1,167,748 | $73,756 | $1,241,504 |
| 2022 | $827,586 | $47,563 | $875,149 |
| 2021 | $430,188 | $84,400 | $514,588 |
| 2020 | $775,485 | $27,594 | $803,079 |
| **TOTAL** | **$4,417,666** | **$330,751** | **$4,748,417** |

95. AJG violated 29 U.S.C. § 1106(b)(1) by dealing with the assets of the plan in its own interest or for its own account when it caused or allowed the payment of commissions and administration fees to itself derived from participant-paid premiums that were Plan assets or derived from transactions involving Plan assets.

96. AJG violated 29 U.S.C. § 1106(b)(2) by acting in a transaction involving the Plan on behalf of a party whose interests were adverse to the interests of the Plan or its participants and beneficiaries, including insurers and other parties dealing with the Plan from whom AJG received compensation tied to participant-paid premiums.

97. AJG violated 29 U.S.C. § 1106(b)(3) by receiving consideration for its own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan, including commissions and administration fees paid by insurance carriers and/or embedded in participant-paid premiums.

98. AJG's receipt and retention of commissions and other consideration were not subject to any exemption applicable to fiduciaries engaged in self-dealing prohibited by § 1106(b), and, in any event, were not properly authorized, disclosed, or structured to satisfy ERISA's requirements.

99. AJG's conduct was knowing, willful, or at least reckless, and undertaken in disregard of its fiduciary obligations of loyalty, resulting in excessive and undisclosed compensation and harm to the Plan and its participants.

100. As a direct and proximate result of AJG's conduct, Plaintiffs and the Plan suffered losses, including but not limited to excessive charges embedded in premiums, diminished Plan and participant assets, and the loss of value and loyalty owed by a fiduciary operating free of self-dealing.

## COUNT I
## Prohibited Transactions and Self-Dealing in Violation of ERISA § 406(b), 29 U.S.C. § 1106(b)

101. AJG, as a fiduciary, violated 29 U.S.C. § 1106(b)(1) by dealing with the assets of the Plan in its own interest or for its own account by arranging, receiving, and retaining commissions and administration fees derived from participant-paid premiums and transactions involving Plan assets.

102. AJG, as a fiduciary, violated 29 U.S.C. § 1106(b)(2) by acting in transactions involving the Plan on behalf of parties whose interests were adverse to the Plan and its participants, including insurance carriers and other counterparties from whom AJG received compensation tied to Plan-related premium flows.

103. AJG, as a fiduciary, violated 29 U.S.C. § 1106(b)(3) by receiving consideration for its own personal account from parties dealing with the plan in connection with transactions

involving the assets of the Plan, including commissions and administration fees paid by insurers and/or embedded in participant-paid premiums.

104. As a result of these violations, AJG is liable for appropriate equitable relief under 29 U.S.C. § 1132(a)(2) and/or (a)(3), including restitution, disgorgement of all compensation and profits, surcharge, and injunctive and other equitable relief, as well as for attorneys' fees and costs under 29 U.S.C. § 1132(g).

**COUNT II**
**Breaches of Fiduciary Duty of Loyalty**

105. Plaintiffs reallege and incorporate by reference the foregoing allegations.

106. In addition to the above and/or in the alternative, as a fiduciary of the Plan, AJG breached its fiduciary duty of loyalty by placing its own interests in receiving commissions ahead of the interests of the Plan and participants, failing to avoid prohibited conflicts, and failing to act solely in the interest of participants and beneficiaries for the exclusive purpose of providing benefits and defraying reasonable plan administrative expenses.

107. As a fiduciary of the Plan, AJG was subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).

108. Pursuant to 29 U.S.C. § 1104(a)(1)(A), AJG was required to discharge its duties to the Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

109. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars in losses.

110. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), AJG is liable to restore to the Plan all losses caused by its breaches of fiduciary duties, and also must restore any profits resulting

from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in their Prayer for Relief.

111. Plaintiffs seek equitable relief under 29 U.S.C. § 1132(a)(2) and/or (a)(3), including restitution, disgorgement, surcharge, injunctive relief, removal of Defendant from any fiduciary role, appointment of an independent fiduciary, accounting, and other appropriate equitable remedies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendant on all claims and requests that the Court awards the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration that the Defendant has breached its fiduciary duties under ERISA;

D. An Order compelling the Defendant to make good to the Plan all losses to the Plan resulting from Defendant's breaches of its fiduciary duties, and to restore to the Plan all profits the Defendant made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendant had fulfilled its fiduciary obligations;

E. An order requiring the Company to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, as necessary to effectuate said relief, and to prevent the Company's unjust enrichment;

F. Actual damages in the amount of any losses the participants suffered, to be allocated among the participants in proportion to their losses;

G. An order enjoining Defendant from any further violations of its ERISA fiduciary responsibilities, obligations, and duties;

H. Other equitable relief to redress the Company's illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached its fiduciary duties;

I. An award of pre-judgment interest;

J. An award of costs pursuant to 29 U.S.C. § 1132(g);

K. An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L. Such other and further relief as the Court deems equitable and just.

Dated: September 17, 2026

Respectfully submitted,

*/s/ Mark K. Gyandoh*

Mark K. Gyandoh, Esquire, PA ID #88587
James A. Maro, Esquire, PA ID #86420
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
jamesm@capozziadler.com
Tel.: (610) 890-0200
Fax: (717) 232-3080